UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | : | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Criminal No. 3:06cr161(EBB) |
| | : | |
| v. | : | |
| | : | |
| **DENNIS BOZZUTO** | : | April 1, 2008 |
| | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

### A. Introduction

In June 8, 2006, the defendant was indicted and charged with racketeering conspiracy. On November 16, 2007, the Court accepted the defendant's plea to Count Two of the Indictment.

On January 18, 2008, the probation office determined that the defendant's base offense level was 19. Subtracting two levels for minor role and three levels for acceptance of responsibility resulted in a total offense level of 14.[1] With a CHC of I, the Guidelines suggest a term of incarceration of 15-21 months and a fine of $4,000 to $40,000.

As described in greater detail below, it is undisputed that in the early phase of the government's investigation the defendant and his company were not participating in the property rights system and, as a result, a co-conspirator had excluded Bozzuto from utilizing the transfer station in Danbury. But, as the investigation revealed, the situation changed. By the time federal agents executed search warrants in July, 2005, the defendant was full fledged member of the property rights system. While he played a minor role relative to some of the other defendants,

---

[1] The probation officer recommends that the defendant not receive credit for minor role as "it is not clear how this defendant is less culpable than most other participants." See PSR ¶ 40. The government believes that a two-level reduction for minor role is appropriate in this case and the defendant should be sentenced within the stipulated range of 15-21 months.

Bozzuto conspired to fix garbage hauling prices in Connecticut, attacked carters at the direction of Richard Galietti, and provided assistance to Galietti. As a reward for being a participant in the property rights system, by July, 2005, Galietti had not only allowed the defendant to utilize the Danbury transfer station, but had actually agreed to pick up the refuse himself and dispose of it for the defendant.

For the reasons stated below, the defendant should be sentenced to a term of incarceration and fined within the applicable guideline range. The government does not object to a sentence of 15 months, which is at the bottom of the range.

Sentencing is currently scheduled for April 3, 2008, at 9:00 a.m.

### B. Offense Conduct

**1.    Early 2004: Defendant "Steals" a Contract from the Indicted Companies and is Locked Out of the Danbury Transfer Station**

In the spring of 2004, the defendant's company secured a large trash hauling contract in North Branford that was "owned" by AWD. As such, it appears that individuals in control of this company retaliated by locking John's Refuse out of a transfer station located in Danbury.[2] During a call intercepted on September 10, 2004 between the Galietti and the defendant, Galietti mentioned the lockout and the defendant responded that "we still got pride." [Call 3769] The defendant added that he is "busy, busy," has "a hundred things cooking," and even taunted Galietti by saying that "tons of money is being made [as a result of the North Branford contract]." Juxtaposed to the literal transcript referenced in the defendant's sentencing memo is the friendly tone of this conversation, which is marked by banter and crude humor - - as are all of the

---

[2] Apparently, John's Refuse did not dump municipal solid waste at the Danbury transfer station, but used it primarily for construction and demolition waste from the job in Danbury.

intercepted conversations.[3]  After initially discussing the lockout, the defendant inquired about several common acquaintances and discussed "Tommy," which was a reference to Thomas Milo - - Galante's silent and supposedly secret partner.  They also discuss Galietti's relationships with various women, and Galietti jokingly informed the defendant that a "property rights" system existed that governed who could have relationships at AWD.  Tellingly, the defendant did not ask what this term meant.  The conversation concluded with the defendant telling Galietti that "if you are up this way . . . swing by."  Galietti agreed.

**2.    Early 2005: The Defendant Regains Favor and Begins Participating in the Property Rights System**

In early 2005, the defendant began to mend his relationship with the co-conspirators.  First, in February, 2005, he warned Galietti that a customer owned by AWD was shopping around for quotes.

Next, in March, 2005, the defendant agreed to submit and artificially high bid for Customer Y, a stop "owned" by ADS.[4]  The defendant admitted to the FBI that he had received a call from an individual at Customer Y asking for a bid.  The defendant advised Galietti of the

---

[3]The relationship between Galietti and the defendant is best appreciated by listening to the intercepted calls.  To facilitate the Court's review of this material, in Attachment A, the government submitted a CD containing several of the calls, including call 3769 (9/10/04), call 37,379 (4/21/05), call 46,453 (6/28/05), call 46,573 (6/29/05) and call 49,999 (7/19/05).

[4]In December, 2004, Customer Y was serviced by ADS, a Galante-owned company.  Dissatisfied with the service and price provided by ADS, Customer Y contacted other trash hauling companies for bids.  After contacting various haulers and receiving several bids, members of Customer Y became suspicious of many of the bids that they received, as these bids were double the price of the ADS rate.  Some trash haulers told Customer Y that they would not provide a quote because Customer Y was serviced by ADS.

request and they discussed Customer Y's account.[5] Later, Bozzuto agreed to "throw a number" so that ADS could retain Customer Y's account, and Galietti asked Bozzuto to "throw a one and a four per yard," which is a request to bid $14 per yard. At that time ADS was charging Customer Y approximately $7 per yard. Bozzuto faxed a bid quoting $10 per yard and Customer Y discarded Bozzuto's faxed bid because they were already paying less to ADS. In his brief, the defendant argues that he "put in a competitive bid of $10/yd." Defendant's Brief at 7. This assertion is perplexing because ADS was then servicing the account at $7 per yard, which was 30% below the bid submitted by the defendant. Not surprisingly, in the end ADS retained the account. Further, when asked by the FBI why he contacted Galietti to warn him of the customer's interest in obtaining a more competitive price and then submitted a high bid, Bozzuto stated that he was getting a good price of $75 per tone to dump refuse at the Danbury transfer station and did not want to ruin it by "stirring the soup."

     Also in March, 2005, the defendant submitted a second high bid to a different customer at Galietti's request. In March, 2005, Preperty, which managed two apartment complexes, solicited bids from other trash haulers, including Bozzuto. As a member of the conspiracy, Bozzuto's first call was to advise Galietti that he had been contacted by Preperty for a bid. The defendant knew from a conversation with Paul Dinardo that the apartment complexes were "owned" by Galante's company and that he should "respect" the account. Galietti instructed Bozzuto to bid "one-four"

---

[5]Initially, Bozzuto called on behalf of Customer Y to convince Galietti to fix an erroneous invoice that ADS had sent to Customer Y.

($14 per yard), which was twice the ADS bid. Bozzuto agreed and faxed the fixed bid to Preperty.[6]

3.  **April 2005: The Defendant Continued His Participation in the Property Rights System By Assisting Galietti and Attacking Another Carter**

After warning Galietti about one account and agreeing to fix two other bids, the defendant continued to expand his participation in the property rights system. On April 21, 2005, Galietti called the defendant to obtain his assistance in providing lids for two six yard containers at an account serviced by a Galante-owned company. [Call 37379] Like all of the conversations between Galietti and the defendant, this discussion was punctuated with crude humor and permeated by a friendly, cooperative tone. In response to Galietti's request for assistance, the defendant said "my kid is going up there now [to fix Galietti's containers]." The discussion then turned to the fact that a large garbage company was leaving Connecticut and Galante was attempting to purchase its business interests. It is apparent that the purchase price would be lowered, thereby saving Galante money, if the amount of contracted work serviced by the large company was decreased. The defendant said "we are trying to hammer [them]. . . keep beating them" and Galietti responded "kick the s— out of it."

4.  **June 2005:  The Defendant Increases His Attacks on Another Carter at Galietti's Direction**

On June 28, 2005, Galietti called the defendant and asked "dude, you taking that f------ stop for me or what?, later identifying the stop as the [large company's] biggie." [Call 46453]

---

[6]Ultimately, Preperty awarded the contract a trash hauler who was not participating in the property rights system. Individuals who worked for Preperty LLC confirmed that they were actively seeking new refuse service. ADS refused to release the management company from the contract. The management felt they were being "strong armed" by ADS and, on one occasion, ordered the salesperson to leave the property and never return or the police would be called.

Later in the conversation it became clear that this stop was serviced by the large company that Galante was attempting to acquire.  The defendant asked if "that [was] the one you wanted me to bid?" and indicated that he needed to talk to one of his employees.  Galietti instructed the defendant to "tell [the employee] to bid it and take it" and later said "they [the large company] are not going to know its me, so you do it, I will pick up the work, and then we are f------ good to go."  Galietti then stated that "they'll [the large company] never know I crippled them."  Later in the conversation, the defendant and Galietti talked about the proposed terms of the sale of the large company's Connecticut business to Galante.  The defendant asked "the deal is still rolling with that thing [meaning the sale of the large companies Connecticut business to Galante], they want too though much right?"  Galietti said "dude, that thing ain't selling, keep hammering them, bro."  Later in the conversation, when talking about the recalcitrance of another hauler to provide assistance to Galietti in another matter, the defendant said "we are all in this thing together . . . what do you have to be a f------ hog for?"  At the conclusion of the call, Galietti told the defendant to "grab" [the stop serviced by the large company] and "we will call it even," an apparent reference to the North Branford account.

      The next day, Galietti and the defendant spoke again. [Call 46573].  After an initial discussion of whether the defendant had done an unrelated favor for Galietti, the conversation returned to the account that Bozzuto had agreed to take for Galietti.  The defendant reported that the bid was due on July 15 and Galietti responded "dude, you can f------ stick it right up their a----."  Galietti then offered to send Tony Luciano, the salesman who bid the contract in 2003 and

would know the relevant numbers, over to meet with the defendant's employee.[7] Bozzuto responded "There you go! If he wants to come by [ . . .] send Tony Luciano, no doubt, . . . "

**5.     The Corrupt Relationship Comes Full Circle: Galietti Agrees to Pick Up the Defendant's Refuse and Dump it at the Danbury Transfer Station**

On July 19, 2005, the defendant called Galietti and asked him to "yo, you dump that thirty yarder over there for me at that school? The job is just about done." [Call 49999]. This was a reference to trash hauling service that the defendant was providing for a construction project in Danbury - - the very same job that was the subject of the call intercepted on September 10, 2004. Galietti, initially confused, asked "Am I doing that for you?" and the defendant reminded him "remember we had our large battle and now we went back to dating and kissing and everything . . ." and then asked him to "dump and put back a 30 [yard container]." (emphasis added). After speaking about women, Galietti asked "when am I f---- getting paid on this dumpster?" and Bozzuto later responded "I'll take care of you, you know that."

It is apparent from this conversation that the relationship had come full circle. Initially, the defendant was denied dumping rights at the Danbury transfer station with respect to the Danbury job. Ten months later - - after tipping off Galietti that his customers were shopping around, fixing bids, agreeing to meet with other co-conspirators to fix prices, and attacking other companies at Galietti's request - - the defendant was plainly an active member of the conspiracy. Now, not only did the Danbury transfer station accept the defendant's refuse but Galietti agreed to pick it up for him, dump it, and return the container to the job site. The benefits of participation in the property rights system are irrefutable.

---

[7]Tony Luciano pleaded guilty to RICO conspiracy and was sentenced to a term of incarceration of 15 months.

**6.      The Defendant Conspired with Other Trash Haulers to Fix Prices**

The defendant contends that he never received any benefit from being a member of the property rights system. By the defendant's own admission to the FBI on October 31, 2005, under a proffer agreement, he acknowledged that he conspired with other haulers.[8] For example, the defendant admitted that prior to this investigation it was common in the Connecticut trash hauling industry to "respect" another hauler's account because price wars only benefited the customers. Bozzuto admitted that, as a result of his experience, he knew what his competitors would charge, and generally did not have to call if a customer was shopping around because he knew what price to quote in order to respect the account. The defendant further admitted that he would notify the owner of at least one other carting company - - a company not owned by Galante - - when its customers contacted John's Refuse and would then quote a price requested by the "competing" company so that this company could keep the account. This scenario, virtually identical to the defendant's recorded conversations with Galietti, reveals that the defendant participated in the property rights system even outside of Galietti's influence.

**7.      The Defendant's Participation in the Property Rights System Was Only Stopped by the FBI's Execution Of Search Warrants in July, 2005**

It is apparent from the evidence in this case that by the spring and summer of 2005 the defendant was an active member of the property rights system. He fixed bids for Galietti. He fixed bids with other carters. He notified both Galante and at least one other carter when their customers were shopping around for a new trash hauler. He agreed to "hammer" another carter in order to benefit his co-conspirators. He agreed to have his employee meet with co-

---

[8] In his statement to the FBI on October 31, 2005, the defendant stated that he had never heard of the "property rights" system.

conspirators in order to fix bids.  His status had been enhanced to the point where he could call Galietti and direct him to pick up a John's Refuse dumpster, empty it at the Danbury transfer station, and return it to the job site.  He was a vested, active member of the conspiracy, albeit in a minor capacity as compared with some of his co-conspirators.

The defendant argues in his brief that "if the government's investigation of Galante concluded prior to March, 2005 . . . he would not have been charged at all." Defendant's Brief at 2.  But that is not what happened and such an argument is of questionable relevance. As this Court knows, the last call intercepted between Galietti and the defendant was on July 19, 2005, a few hours before federal agents began executing numerous search warrants, including one at the defendant's business.  Not surprising, after the investigation became overt, no further calls between the defendant and Galietti were intercepted.  It could very well be said that, but for the government's intervention, the defendant's participation in the property rights system - - both with the indicted co-conspirators and other carters - -  would have continued unabated.

### C.  Conclusion

This defendant was an active participant in the property rights system and should be sentenced to a term of incarceration and fined within the stipulated Guideline range.

                    Respectfully submitted,

                    KEVIN J. O'CONNOR
                    UNITED STATES ATTORNEY


                    RAYMOND F. MILLER
                    ASSISTANT UNITED STATES ATTORNEY
                    FEDERAL BAR NO. CT 20451
                    157 CHURCH STREET
                    NEW HAVEN, CONNECTICUT 06510

      This is to certify that a copy of the within and foregoing has been both filed electronically and emailed/faxed this 1st day of April, 2008 to:

Attorney Robert Casale

USPO Ray Lopez

                                                RAYMOND F. MILLER
                                                ASSISTANT UNITED STATES ATTORNEY